**CITIZENS ASSOCIATION OF GEORGE- TOWN, INC., Petitioner,**

v.

**DISTRICT OF COLUMBIA ALCOHOLIC BEVERAGE CONTROL BOARD, Respondent,**

**1204½ Thirtieth Street, Inc., Intervenor.**

**No. 13902.**

District of Columbia Court of Appeals.

Argued April 26, 1979.

Decided Sept. 19, 1979.

---

Courts Oulahan, Washington, D. C., for petitioner.

Leo N. Gorman, Asst. Corp. Counsel, Washington, D. C., with whom Louis P. Robbins, Acting Corp. Counsel, Washington, D. C., at the time the brief was filed, and Richard W. Barton, Deputy Corp. Counsel, Washington, D. C., were on the brief, for respondent.

Wharles T. Taylor, Washington, D. C., for intervenor.

Before KERN, HARRIS and MACK, Associate Judges.

KERN, Associate Judge:

Citizens Association of Georgetown, Inc. (Citizens), has filed this petition for review of an order issued by the Alcoholic Beverage Control Board (Board) granting a Class "C" Restaurant liquor license for premises at 1204½ 30th Street, N.W., located in the Georgetown section of the city.

■ Petitioner contends the Board committed various errors prior to and during the hearing it conducted on the liquor license application which now require reversal of its order. First, Citizens argues that the Board violated its own regulation, 3 DCRR § 2.4(a), which provides in pertinent part:

Where an application for the issuance . . . of an alcoholic beverage license for any place has been denied by the . .

Board, a second application for the same class shall not be considered within . . one year from the date of denial of the first . . . [p]rovided . . . [t]hat where . . . new pertinent evidence is presented, the Board may, in its discretion, designate an earlier date for the filing of such new application.

The record reflects that (1) in December 1976, the Board had denied an application for a Class "C" Restaurant liquor license at this address; (2) in September 1977, the applicant asserted to the Board "it has new relevant evidence to show why a license should be granted" and sought leave from the Board to file a new application "within" the one year period; and (3) in October 1977 the Board granted the request and in December 1977 held a public hearing on the "new" application.

■ We could not say the Board abused the discretion Section 2.4(a) confers upon it "to designate an earlier date for the filing of such new application . . . where new pertinent evidence is presented" given the obvious import of the "new pertinent evidence" the applicant asserted it was prepared to present to the Board, viz., the main protestor would not again protest issuance of the license; applicant had entered into contracts for trash removal; and, applicant had made arrangements for valet parking and obtained parking facilities and about 400 signatures favoring a restaurant at the location.[1]

■ Petitioner next contends the Board scheduled the public hearing in December 1977 on the renewed application for a license at this address upon such short notice as to preclude adequate preparation and presentation of the case in opposition to this application. Petitioner was familiar with the basic facts of this case as a result of its successful opposition in the proceeding held the year before on the first application; the Board held another public hearing after December 1977 in June 1978; and, the record reflects effective opposition on the part of petitioner throughout the case. Accordingly, we are unable to say the Board's holding of one of the hearings in December 1977 to which no objection was made, so prejudiced petitioners as now to require reversal of the Board's grant of the license.

■ Petitioner also objects to evidentiary rulings by the Board during the hearing, viz., admitting into evidence certain signatures favoring the granting of the license, and refusing to admit a written statement submitted by the Advisory Neighborhood Commission (ANC) in opposition to the application and certain photographs offered to depict conditions around the premises in question. We are satisfied that the Board had some basis for its rulings and that these rulings did not unduly favor the applicant's case or impair petitioner's opposition.[2]

■ Petitioner challenges the Board's conclusion that the place for which the license was sought "is appropriate considering the character of the premises, surroundings and the wishes of the persons residing in or owning property in the neighborhood." D.C.Code 1973, § 25–115(a)6. Such conclusion appears rationally to flow from the findings the Board made as to the character of the neighborhood, the size of the restaurant proposed and its type of menu and the hours of its serving, the efforts undertaken by the applicant to eliminate kitchen odors and noise of operation, the arrangements made for removal of trash, and finally, the availability of parking spaces for its cus-

---

1. We are not persuaded by petitioner's further argument that the decision of the Board to grant or deny a previously unsuccessful applicant's motion to file a second application within less than one year from the prior denial is an order in a "contested case" as this term is defined in the District of Columbia Administrative Procedure Act, D.C.Code 1973, § 1–1501 et seq. Such a motion seeks only to have the Board consider an application and is not a proceeding in which there is a legal or constitutional requirement to hold a hearing before granting or denying the motion.

2. The ANC opposition was orally presented to the Board, some of the photographs were permitted into evidence and the signatures favoring the application were deemed in substantial compliance with the Board's Rules and Regulations as to warrant their consideration.

tomers and "the anticipated percentage of walk-in customers" which the Board found, taken together, "will not significantly impact heavily upon the parking, traffic condition or public safety." [3] *See Citizens Association of Georgetown v. District of Columbia Alcoholic Beverage Control Board*, D.C. App., 268 A.2d 801 (1970).

■ Petitioner contends the Board erred in concluding the applicant corporation's principal officers were "of good moral character and generally fit for the trust" to be placed in them by the grant of the license, *see* D.C.Code 1973, § 25–115(a)(1), because the applicant's President did not reveal in the application filed with the Board for the license that (1) he had been indicted in 1970 in Fauquier County, Virginia, and that (2) he had been charged in 1968 with the crime of being present in an illegal establishment. The record reflects (and the Board so found) that both charges had been *nolle prossed*. The Board further found:

> In neither instance did Mr. English [the President] recognize the necessity of disclosing this information to the Board by listing the same on his application. The Board, however, is not satisfied that his failure to disclose this information was done knowingly and with the intent to mislead the Board.

Given the particular nature and subsequent disposition of these charges and the ability of the Board to observe this witness' demeanor in considering the credibility of his explanation for not recognizing these charges as arrests for the purpose of completing the application form [4] (Record at 135), we cannot say the Board's conclusion that the applicant's President was "of good moral character and generally fit for the trust" is clearly wrong or lacks "substantial, probative evidence of record." *Citizens Association of Georgetown v. District of Co-*

*lumbia Alcoholic Beverage Control Board*, D.C.App., 288 A.2d 666 (1972).

Petitioner's final argument is that the Board granted the license in the instant case upon the basis of an erroneous interpretation of its own regulation. 3 DCRR § 8.3 provides in pertinent part:

> [N]o license shall be issued for the sale or consumption of beverages in any building, *a part of which is used as a dwelling or lodging house*, unless the applicant shall file his affidavit stating that access from the portion of said building so used as a dwelling or lodging house to the portion where the said applicant desires to sell said beverages is effectively closed. . . . (Emphasis added).

The record contains a report by the Board's investigator of an inspection of the premises which reads in relevant part:

> The restaurant is housed on the second floor of 1204½ 30th Street, N.W. There are fourteen steps leading from the first floor landing to the second floor. The door to the restaurant is immediately to the right, upon reaching the second floor. An immediate left leads to the stairs (16 in all) leading to the third floor. Upon reaching the third floor one must make a left turn to proceed any further; at this juncture there is another door. Upon entering this door you immediately face yet another door which opens to a three room apartment. This apartment is occupied and fully furnished. Mr. Oulahan stated that the apartment is occupied by Mrs. Lucy Dickey, the owner of the building. This could not be verified at this time by the undersigned. Before entering the third floor apartment, immediately to the left, there is another set of steps (13 in all) leading to the studio apartment. This apartment is a large one room studio apartment, that is fully furnished and obviously occupied. . . .

---

3. Petitioner challenges the Board's finding that walk-in customers would comprise 90% of the restaurant's patronage as lacking evidentiary support. We view the record as containing substantial evidence (Record at 108–09), from which the Board could make the finding it did. *Sophia's Inc. v. D.C.A.B.C. Bd.*, D.C.App., 268 A.2d 799, 801 (1970).

4. In light of the record we reject petitioner's contention that the Board relied upon representations of counsel rather than testimony from the applicant's President in reaching its conclusion he was not knowingly suppressing relevant information.

It should be noted that tenants of the third and fourth floor apartments can not gain access to or exit from their individual apartment without passing directly by the door that is currently the only entrance to the restaurant. This door could not be effectively closed as it would deny access to the restaurant to customers and staff of the business.

The Board in its order granting the application stated that it "has approved door waivers in instances where said door is located entirely inside the licensed premises and leads directly inside the living quarters. *In these instances, the owners of the businesses maintained their living quarters immediately above or to the rear of the businesses.* In order to enter his business— without going outside the building—the Board has waived the requirement of sealing the door . . . . *The entrance and exit to the proposed licensed premises lead into a common hallway—not between dwelling and proposed premises.* Accordingly the Board finds that Section 8.3 . . is not applicable." (Emphasis added.)

 The Board's conclusion that Section 8.3 does not apply to the instant situation but rather applies only to situations where the licensee's "living quarters" are in the same building where the licensee is selling liquor for consumption and where there is direct access by door between these two areas, does not appear to us to be plainly erroneous or inconsistent with the Regulation's own terms.[5] The record reflects that the particular building in which applicant was granted a license by the Board's order is serving various purposes: it contains a restaurant on its ground floor, applicant's restaurant on the second floor, a three-bedroom apartment on the third floor, and a one-room studio apartment on the fourth floor. There was no showing that the occupants of the apartments have any relationship to the applicant. The building containing both dining facilities and living quarters strikes us as being analogous to a hotel or club, which are expressly excepted

from the regulation. We are not persuaded that the Board's conclusion that its regulation is inapplicable to the applicant under these circumstances is erroneous.

Accordingly, the Board's order must be *Affirmed.*

---

5. Section 8.3 was enacted in 1943 without any indication so far as we are advised or have been able to ascertain of the precise purpose of its enactment.